UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PHILIP F. PIERCE, | : | |
| and SHARON C. PIERCE | : | |
| PLAINTIFFS, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:04-cv-1767 (JCH) |
| EMIGRANT MORTGAGE CO., | : | |
| EMIGRANT SAVINGS BANK, | : | |
| and RETAINED REALTY, INC., | : | DECEMBER 27, 2007 |
| DEFENDANTS. | : | |

**BENCH TRIAL RULING**

The plaintiffs, Philip F. Pierce and Sharon C. Pierce (collectively, the "Pierces"), who are residents of Connecticut, bring this action for declaratory relief, breach of contract, breach of implied contract, unjust enrichment, breach of implied duty of good faith and fair dealing, and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110 <u>et seq.</u>, against the defendants, Emigrant Mortgage Company, Inc. ("Emigrant Mortgage"), Emigrant Savings Bank ("the bank"), and Retained Realty, Inc. (collectively "defendants"), all of which are corporations with their principal places of business and citizenship in New York. The suit arises out of the terms of a loan agreement (the "loan" or the "mortgage") that the Pierces had entered into with Emigrant Mortgage. The Defendants removed this action from the Connecticut Superior Court for the Judicial District of Stamford, pursuant to 28 U.S.C. §§ 1441 and 1446. Jurisdiction is based on the diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1332.

In its September 29, 2005 Ruling, the court held that the loan was not usurious

1

under Connecticut General Statute § 37-4. (Doc. No. 32). The court later granted summary judgment as to Count Seven of the Complaint, which stated a claim of civil conspiracy against the defendants. See Ruling Re: Def.'s Mot. for Summ. Judg. (Doc. No. 66). The Pierces' remaining claims were tried before the court on November 27 through November 30, 2007.

I.      **FINDINGS OF FACTS**

The Pierces bought a home at 14 Martin Dale, in Greenwich Connecticut, in the late nineteen-nineties for almost one million dollars. They bought the house with cash. At the recommendation of their real estate broker, the Pierces hired Attorney Frank J. Gilbride II to serve as their attorney in purchasing the house.

In early fall of 1998, the Pierces approached Will Robinson at the local branch of Chase Bank about taking out a home equity loan for making home improvements to 14 Martin Dale. The Pierces had previously taken out a home equity line of credit worth $200,000 from Chase with the assistance of Robinson, and they felt they had a good working relationship with him as a result of that experience. The Pierces and Robinson discussed taking out a mortgage worth about $650,000 with a variable interest rate around 6.5%, and a monthly payment around $4,200. Robinson did not ask the Pierces any questions about their financial situation. Mr. Pierce assumed Robinson did not ask because they had "history" with Robinson, and that he already knew what he needed to know to make the loan.

On October 30, 1998, the Pierces signed an application for a "High Equity Plus Loan Application". Pl.'s Ex. 1. The High Equity Plus Loan program at Emigrant Mortgage had fewer income verification requirements than traditional mortgages, with

calculated contract interest rates based upon such factors as the loan-to-value ratio and the applicant's credit score. The Pierces' application provided for a loan amount of $650,000, at an adjustable interest rate of 6.5%, and a term of thirty years. Id. The mortgage was to given solely by Mrs. Pierce. Id. On the application, Mr. Pierce listed his occupation as the President and CEO of the securities firm of Butler, Larsen, Pierce and Co., Inc., and stated that he had worked in the securities business for 20 years. Id. The Pierces disclosed on the loan that they held two other mortgages, one on 14 Martin Dale, and the other on a home they owned in Arizona. Id. The Pierces had also had two other mortgages in the past. Both Pierces are native English speakers with college degrees. Mr. Pierce has worked as a municipal bond brokerage broker for over twenty five years. Prior to her marriage, Mrs.. Pierce held positions as a sales representative and an advertising representative, for Bethlehem Steel and Rossignol and worked as an actress and model.

On December 24, 1998, the Pierces each executed a Power of Attorney, appointing Attorney Gilbride to act as their attorney-in-fact in "real estate transactions" and "banking transactions." Pl.'s Ex. 2 and 3. The Pierces did this so that they could close the High Equity Plus Loan they had applied for, at the interest rate they had discussed with Robinson. The Pierces were leaving the state to visit family in Colorado and were anxious that the loan be closed while they were away. At the time the Powers of Attorney were executed, neither the Pierces, nor Attorney Gilbride, had the mortgage documents in their possession and thus had not reviewed them. At the signing of these forms, Attorney Gilbride informed the Pierces that Emigrant was to be their lender and informed them that he had represented Emigrant in a limited capacity in the past. He

3

also consulted with them about the possibility that he would similarly represent Emigrant in this transaction, and they consented to such dual representation.

On or about December 29, 1998, the note was executed on the Pierces' behalf by Attorney Gilbride, acting as their attorney-in-fact. See Pl.'s Ex. 6. At the closing, Attorney Gilbride executed a number of documents on behalf of the Pierces in addition to the note. Most notable among these documents was a Commitment Letter, dated December 29, 1998. See Pl.'s Ex. 4. This document included a provision requiring the Pierces to pay a late charge of 5% of the overdue payment in the event that their payment was not received by the 15th of each month. Id. at ¶ 6. It also contained an "attached conditional rider" regarding the default interest rate on the loan ("the default interest rate rider"), which rider provided that

> in the event of default under your loan documents, the interest rate of this loan . . . will be increased to %18 [sic] percent per annum without notice to you, until the loan is satisfied or all defaults, including any and all arrears, are cured under the terms of the Mortgage Agreement. The increase will accrue from the default date, as described above. Emigrant will, at its option, notify you of the increase in the interest rate by virtue of an increased payment amount notation on your billing statement. If for any reason you fail to make a payment within thirty (30) days of the due date, or perform any of the obligations, as described in the Mortgage Agreement, then for purposes of imposing a default interest rate, you will be in default. Id. at ¶ 18.

The commitment letter contained a statement that Attorney Gilbride "solely represent[s] Emigrant Mortgage Company, Inc." Id. at ¶ 22. That statement was followed by this language:

> Notice: The interests of you, the borrower and Emigrant Mortgage Company, Inc. as Lender, are or may be different and may conflict. Emigrant's attorney represents only Emigrant Mortgage Company. You are advised, therefore, to employ an attorney of your choice, licensed to practice law in the state where the premises is located, to represent your

4

interest.  Id. (emphasis in original).

The mortgage itself contained terms that provided that Emigrant Mortgage could accelerate the date on which the total amount under the mortgage was due following a default by the borrower.  Pl.'s Ex. 5, at ¶ 21.  In a rider to this document, there is a provision that allows that "[t]he Lender may, after default, if so permitted by law, foreclose the mortgage so that the property may be sold subject to the mortgage given as security herein."  Id., Rider to Mortgage, at ¶ 35.

The Pierces received the Commitment Letter, and the other loan documents, in the mail after they returned from Colorado in early January 1999.  The Pierces were not aware of the default interest rate rider prior to the time Attorney Gilbride closed the loan on their behalf.  The Pierces did not read the Commitment Letter, or any of the other documents signed in connection with their loan.  The Pierces did not ask any questions of Attorney Gilbride or Robinson about the terms of the documents.  Subsequent to the parties closing on the note in issue, Emigrant Mortgage assigned the loan and the mortgage to Emigrant Savings Bank.

Mr. Pierce first realized that the loan was with Emigrant, and not Chase, in March or April of 1999, when he got a letter from them informing him that his payment was overdue.  He had expected to receive a coupon book or bill in the mail regarding his first payment, not realizing that the bill for the first payment was included in the loan documents he received.  When he received the bill he called Emigrant and they agreed to waive the late fees that had accrued.  Mr. Pierce then began regular payments on the loan.

Mr. Pierce eventually left his employment with Butler, Larsen, Pierce and Co.,

Inc. to start a new company called "eBond USA." When this company failed, Mr. Pierce found himself unable to meet his financial obligations. He failed to make his mortgage payment to Emigrant in June 2000. By letter dated July 10, 2000, Emigrant Mortgage, on behalf of Emigrant Savings, notified the plaintiffs that their loan was in default and was therefore accruing interest at the 18% default interest rate. See Pl.'s Ex. 13. The letter also indicated that, if the plaintiffs failed to cure the default by August 16, 2000, the loan would be accelerated and become due in its entirety. When the Pierces did not cure the default, Emigrant Savings, which held the note at that time, accelerated the Pierces' debt and charged the Pierces a monthly late fee of five percent on the loan.

Emigrant Mortgage, which serviced the loan on behalf of Emigrant Savings, informed the Pierces on August 22, 2000, that foreclosure proceedings were being brought against them. See Letter, Pl.'s Ex. 15. Emigrant Mortgage referred the file to their attorney, Dan Nagel, on August 21, 2000. See Pl.'s Ex. 25 at 360. Emigrant Mortgage also instructed the Pierces to deal exclusively with Attorney Nagel, with regards to foreclosure. See Pl.'s Ex. 15. In 2000 and 2001, Mr. Pierce contacted Attorney Nagel in an attempt to have the default interest and late fees waived as they had been waived when the Pierces failed to make their first payment in 1999. Attorney Nagel explicitly rejected Mr. Pierce's first settlement offer and never responded to subsequent attempts by Mr. Pierce to bring the loan out of default.

The foreclosure department at Emigrant Mortgage believed that Attorney Nagel was proceeding with a foreclosure action against the Pierces, as they had instructed him to do. It took approximately two years for Emigrant to realize that it was not receiving the paperwork and updates it would have expected to receive in a foreclosure

6

action and discovered that Attorney Nagle had not commenced the foreclosure.

With new counsel hired in September 2003, Emigrant Mortgage finally brought a state court action to collect on the loan agreement and foreclose on the mortgage. Emigrant Savings subsequently assigned the loan and mortgage to Retained Realty. While the state court action was pending, Sharon Pierce sold the Greenwich property to her sister for approximately $1.7 million. In a November 2003 letter, Retained Realty demanded payment of $1,053,570.73 before it would discharge the loan in full and withdraw the 2003 action. This figure included the late fees and default interest Retained Realty claimed accrued during the period the loan was delinquent between June 2000, and November 2003. The Pierces paid this sum to Retained Realty but retained, by letter accompanying this settlement amount, their right to pursue any legal remedy they may have. At the start of this trial, Emigrant returned $7,760.60 to the Pierces, which is the value of the late fees which accrued after the acceleration of the loan that were included in the amount paid to discharge the loan.

## II. CONCLUSIONS OF LAW

### A. Request for Declaratory Judgment (Count One)

#### 1. Standard

The plaintiffs seek a declaration that the loan agreement was void <u>ab initio</u> due to unconscionability. <u>See</u> Complaint, Count One, at 1 (Doc. No. 1). The Declaratory Judgment Act provides that "[in a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration

7

. . . ." 28 U.S.C. § 2201.

The basic test for determining whether the terms of a real estate note or mortgage are unconscionable under Connecticut law is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." Hamm v. TaylorConn, 180 Conn. 491, 495-96 (1980) (citing Official Comment 1 to § 2-302 of the Uniform Commercial Code). As Hamm suggests, determining whether a particular agreement is unconscionable requires a fact-intensive examination of the agreement at issue. See Monetary Funding Group, Inc. v. Pluchino, 87 Conn.App. 401, 411-412 (Conn.App. 2005) (quoting Family Financial Services, Inc. v. Spencer, 41 Conn.App. 754, 762-63 (1996)); see also Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 87-89 (1992). Ultimately, however, the issue of unconscionability is a question of law to be decided by the court. Iamartino v. Avallone, 2 Conn.App. 119, 125 (1984).

At its core, the doctrine of unconscionability protects parties to a contract from oppression and unfair surprise. Cheshire Mortgage, 223 Conn. at 88. Connecticut law reflects these two concerns by dividing the unconscionability inquiry into a substantive and a procedural component. "Substantive unconscionability focuses on the 'content of the contract' as distinguished from procedural unconscionability, which focuses on the 'process by which the allegedly offensive terms found their way into the agreement.'" Id. at 87 n. 14 (quoting J. Calamari & J. Perillo, Contracts (3d Ed.) § 9-37. Factors the court may consider in resolving whether a certain interest rate is unconscionable include, but are not limited to, "[t]he financial circumstances of the borrower, the

8

increased risk associated with a second mortgage, and the income-producing capacity of the mortgaged property." Hamm, 180 Conn. at 495.

    1.  The mortgage was not procedurally unconscionable.

In determining whether the loan was procedurally unconscionable, the court considers the facts that both of the Pierces are native English speakers with high levels of education, that they had had several mortgages prior to the one at issue, that they were represented by competent and experienced counsel of their choice at the closing, that they placed no limitations on the Power of Attorney they signed over to Attorney Gilbride, that they chose not to read the loan documents themselves or attend the loan closing where their attorney would have gone over the terms with them, and that they were not taking out the loan in financial desperation, nor was this the only lender willing to give them a loan. All of these facts weigh against this loan being procedurally unconscionable.

In support of their position, the Pierces have shown that neither Robinson nor Attorney Gilbride went over the terms of the mortgage with them. However, it is clear that the Pierces never requested to go over the terms with either Robinson or Attorney Gilbride. In fact, the Pierces chose, contrary to Attorney Gilbride's advice, not to attend the closing of the loan, where he would have gone of the terms of the loan with them. The Pierces' ignorance of the terms of the loan cannot rest with Robinson or Gilbride when the Pierces forsook the opportunity to review the terms of the loan with their attorney.

The Pierces also point to a potential conflict created by Attorney Gilbride's representation of both the Pierces and Emigrant Mortgage at the closing. See

9

Commitment Letter at ¶ 22. Potential conflicts raised by this type of dual representation were addressed by the Connecticut Bar Association Committee on Professional Ethics Informal Opinion 89-02 ("Informal Opinion 89-02"). In Informal Opinion 89-02, the committee found that the question of dual representation in residential mortgage closings is governed by Rule 1.7(b) of the Rules of Professional Conduct. At the time Informal Opinion 89-02 was written, and at the time Attorney Gilbride represented the Pierces in the closing, Rule 1.7(b) stated that:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client . . . unless: (1) The lawyer reasonably believes the representation will not be adversely affected, and (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved. Connecticut Practice Book, Revision of 1998, at 9-10.

The court finds that Attorney Gilbride's dual representation did not adversely affect his representation of the Pierces. As Informal Opinion 89-02 notes, an attorney could reasonably conclude that, "in situations involving residential mortgages, the interest of the bank and the mortgagor are so similar that there is no material limitation on your responsibility by virtue of the dual representation." Informal Opinion 89-02. Attorney Gilbride understood, and informed the Pierces, that the terms of the mortgage would not be negotiable and therefore his role as their attorney would not be compromised by also representing the bank in the closing. The court credits Attorney Gilbride's testimony that he consulted with the Pierces about the possible conflict arising from his dual representation and that they consented to it in accordance with Rule 1.7(b)(2). Therefore, the court concludes that Attorney Gilbride's dual

10

representation of Emigrant and the Pierces at the closing of the loan was not a conflict as it is defined in the Rules of Professional Conduct and thus did not make the Pierces' mortgage procedurally unconscionable.

2. The mortgage was not substantively unconscionable.

In order for the terms of the mortgage to be substantively unconscionable, they must be "so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." Cheshire Mortgage, 223 Conn. at 89. The terms at issue here are the 18% default interest rate rider, coupled with the term allowing Emigrant to accelerate the loan. The court finds that, as a matter of law, these terms are not substantively unconscionable.

As an initial matter, the court credits the expert testimony of Michael Madison, that the term allowing Emigrant to accelerate the mortgage was a common term in residential mortgages. Turning to the default interest rate, the court concludes that an 18% interest rate triggered in the even that a borrower defaults on a mortgage is not so one-sided as to rise to the standard of unconscionability. The Cheshire Mortgage Court upheld the legality of an 18% interest rate, without even discussing whether the interest rate was so high as to be unconscionable. Id. at 86-93. Furthermore, in that case, the 18% rate was the contract rate for the loan and not merely the default rate, as was the case in the Pierce's mortgage. Id. If an 18% interest rate was not so one-sided as to be unconscionable as the contract rate in Cheshire Mortgage, it cannot be unconscionable that it served as the default rate on the Pierce's mortgage.[1] Having

---

[1]The court notes that unpaid property taxes in Connecticut are subject to an 18% interest rate. See CONN. GEN. STAT. § 12-146. While there may be public policy considerations which would justify an 18% interest rate on unpaid taxes which would not apply to an 18%

11

concluded that the Pierces' mortgage was neither procedurally, nor substantively unconscionable, the court finds for the defendants on Count One.

**B.  Mr. Pierce's Specific Claims**

1. Breach of Contract (Count Two) and Breach of Implied Contract (Count Three)

Philip Pierce asserts a claim for breach of contract and breach of implied contract. Both of these claims are predicated on the notion that the default interest rate was an "excessive or unconscionable amount of interest." See Complaint, at 6-7 (Doc. No. 1). Having previously determined that the 18% default interest rate does not violate Connecticut General Statute § 37-4 (see Ruling on Motion to Dismiss at 7-8 (Doc. No. 32)), and finding that the default interest of 18% applicable to the loan was not unconscionable, Mr. Pierce's claims for breach of contract and breach of implied contract must fail.

2. Unjust Enrichment (Count Four)

Philip Pierce asserts a cause of action for unjust enrichment. "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." Gagne v. Vaccaro, 255 Conn. 390, 408 (2001) (quoting Franks v. Lockwood, 146 Conn. 273, 278, 150 A.2d 215 (1959)). Unjust enrichment is a "broad and flexible equitable doctrine." Id. (internal quotation omitted). The elements of the claim are that, "(1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of

---

default interest rate on a residential mortgage, the Connecticut legislature's imposition of an 18% rate for unpaid taxes suggests that such a rate is not unconscionable per se.

payment was to the plaintiff's detriment." Kull v. Davidoff of Geneva, No. 01-CIV-4821, 2004 WL 1418088, at *15 (S.D.N.Y. 2004)(citing Gagne, 255 Conn. at 409). In analyzing the unjust enrichment claim in Gagne, the Connecticut Supreme Court asked whether the defendant had received a benefit from the plaintiff "under circumstances that would otherwise make it unjust" for him to retain that benefit. Gagne, 255 Conn. at 408.

The large amount of default interest, $247,258.96, paid by the Pierces in this case accrued as a result in the long delay in foreclosing on their home. The Pierces were initially notified of Emigrant Mortgage's intent to foreclose on their home by letter dated August 22, 2000. Following that notification Mr. Pierce made an effort to bring the loan out of default by making an offer to Attorney Nagle. That offer was refused. Mr. Pierce attempted to further contact Attorney Nagle in an effort to bring the loan into good standing, but received no response. Because Mr. Pierce reasonably relied on Emigrant Mortgage's instruction to direct "all inquiries" regarding the mortgage to Attorney Nagel, Mr. Pierce reasonably believed that any further attempts on his part to resolve the action would be futile. Mr. Pierce took what steps he could to bring the mortgage out of default soon after the default interest rate took effect. When those steps failed to resolve the issue, he reasonably believed that no further action on his part would prevent foreclosure on his home by the bank.

The delay in foreclosing on the Pierces' home was not an act of bad faith by the bank. It is clear from the evidence presented to the court that the bank reasonably believed that Attorney Nagle was proceeding with the foreclosure as instructed, and that the bank restarted the foreclosure soon after realizing Attorney Nagle had not

13

followed their instructions. However, "while bad faith may [be] relevant to the inquiry of whether justice *required* recovery," a plaintiff is not compelled to establish bad faith in order to recover under a theory of unjust enrichment. Gagne, 255 Conn. at 410.

Under these circumstances, the court concludes that Emigrant received the benefit of the 18% default interest rate for the protracted period of time between when Nagle stopped returning Mr. Pierce's calls and the time when the foreclosure on the Pierce's home actually began in 2003. This benefit was unjust, as it was at the expense of the Pierces who had reasonably believed that they could do nothing to forestall the foreclosure due to Attorney Nagel's failure to return their calls. It is true that the terms of the mortgage allowed the bank to foreclose after default "at its option" and thus the bank had no contractual obligation to foreclose in a timely manner. However, equity requires that where the bank's agent failed to acknowledge Mr. Pierce's attempts to bring the loan current, or to proceed with the foreclosure, the bank unjustly received the benefit that resulted from Attorney Nagle's delay.

3. Breach of Implied Duty of Good Faith and Fair Dealing (Count Five)

Mr. Pierce asserts a cause of action against the defendants for breach of the duty of good faith and fair dealing. "To constitute a breach of [that duty], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. Bad faith means more than mere negligence; it involves a dishonest purpose." Collins v. Anthem Health Plans, Inc., 275 Conn. 309, 333-34 (2005)(quoting De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004)). As noted above, there were no acts of bad faith on the part of the defendants. Therefore, they

14

did not violate an implied duty of good faith and fair dealing.

### 4. CUPTA (Count Six)

Philip Pierce asserts a cause of action for violation of CUTPA. Connecticut General Statute § 42-110b provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b. CUTPA's "coverage is broad, and its purpose remedial." Cheshire Mortgage, 223 Conn. at 113-4 (internal quotation omitted). To determine whether an practice violates CUTPA, courts examine these factors:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." Sanghavi v. Paul Revere Life Ins. Co., 214 Conn. 303, 311-312 (Conn.1990)(citations omitted).

"All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Cheshire Mortgage, 223 Conn. at 106. However, "to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an 'ascertainable loss' due to a CUTPA violation." Collins, 275 Conn. at 334-335.

First, the common law theory of unjust enrichment is an "established concept of unfairness" that has been violated by defendants. Sanghavi, 214 Conn. at 311-2. Second, the Pierces have evinced no evidence to show that the failure to foreclose in a

15

timely manner was "immoral, unethical, oppressive or unscrupulous." Cheshire Mortgage, 223 Conn. at 112 (concluding that the second factor was not satisfied where the record did not reflect any intent to deceive on the part of the lender).

Turning to the third factor, the court must decide whether the practice at issue caused a substantial injury to the Pierces. The Cheshire court applied a three part test adopted by the Federal Trade Commission to determine whether an injury satisfied the third prong: whether the injury was (1) substantial; (2) outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) not an injury that the consumers themselves could have avoided. See id. at 113 (internal citation omitted). The payment of almost $250,000 in default interest was surely a substantial injury to the Pierces. There was no benefit to consumers or competition brought by the delay in filing the foreclosure of their home. It is more difficult to determine if this was an injury Mr. Pierce could have avoided. On the one hand, there are things that Mr. Pierce could have done to avoid accruing the default interest rate for such a long period of time; for example, he could have tried to contact the bank directly when his communications with Attorney Nagel failed, or he could have sold his house earlier. However, on the other hand, the court is persuaded that when Mr. Pierce's efforts to bring the mortgage out of default were ignored by Attorney Nagle, Mr. Pierce reasonably believed that any further attempts to bring the loan current on his part would not be heeded and that foreclosure would be eminent. Mr. Pierce's belief that he had done what he could was based on Attorney Nagel's action and inaction, not Mr. Pierce's own recalcitrance. Therefore, the court concludes that Attorney Nagel's failure to respond to Mr. Pierce's attempts to bring the loan out of default, coupled with the long

16

delay in foreclosing on the property, constituted a substantial injury to Mr. Pierce.

Looking at the three factors of the CUTPA test in conjunction, the court finds that the bank's failure to respond to Mr. Pierce's attempts to bring the loan out of default and its long delay in filing the foreclosure did not constitute a violation of CUTPA. The second element that the delay be "immoral, unethical, oppressive, or unscrupulous" was not established and the determination that Mr. Pierce was substantially injured presents a close issue. Id. Given the factual circumstances of this case, the court does not find the first element present to a substantial degree. The minimal extent to which the first and third elements are present does not constitute an unfair practice of the type addressed by CUTPA. See Id. at 113-4. Therefore, the court finds that the defendants did not violate CUTPA.

### III. Damages

Mr. Pierce was damaged by the amount of default interest he paid as a result of the delay caused by Emigrant Mortgage through the inaction of Attorney Nagel. Default Interest began to accrue on July 1, 2000, one month after the Pierces failed to make their mortgage payment for the first time on June 1, 2000. See Pl.'s Ex. 13. The Pierces paid off the loan on November 18, 2003. See Def.'s Ex. 72. Therefore, default interest accrued for a total of 41.6 months. The total amount of default interest paid by the Pierces was $247,258.96. See Pl.'s Ex. 39.

The court finds that defendants were unjustly enriched by the amount of default interest paid by the Pierces for the period of time between when Attorney Nagel stopped responding to Mr. Pierce's calls and the time when the defendants transferred the foreclosure action to Attorney Ziegler. Mr. Pierce testified that he last attempted to

17

contact Attorney Nagel in December 2001 or January 2002. The Foreclosure Department at Emigrant Mortgage transferred the file to Attorney Ziegler on September 25, 2003. See Pl.'s Ex. 25 at 361. The total number of months between January 1, 2002 and September 25, 2003 is 20.8. Therefore, the Pierces are entitled to an amount in damages proportionate to 20.8 months worth of the 41.6 total months during which default interest accrued, or $123,629.48.

Mr. Pierce also demanded prejudgment interest pursuant to Connecticut General Statute § 37-3a. See Complaint at 11 (Doc. No. 1). Section 37-3a provides that "interest at a rate of ten per cent a year, and no more, may be recovered . . . as damages for the detention of money after it becomes payable." CONN. GEN. STAT. § 37-3(a). The award of interest as an element of damages is "primarily an equitable determination and a matter lying within the discretion of the trial court." McCullough v. Waterside Associates, 102 Conn.App. 23, 33 (2007)(quoting O'Leary v. Industrial Park Corp., 211 Conn. 648, 653 (1989). The "real question" in determining whether to award prejudgment interest is "whether the detention of the money is or is not wrongful under the circumstances." Id. (quoting Cecio Bros., Inc. v. Feldmann, 161 Conn. 265, 275 (1971).

The court concludes that the award of prejudgment interest in this instance would be inappropriate for two reasons. First, in First Federal Savings and Loan Association of Rochester v. Charter Appraisal Co., 247 Conn. 597, 612 (1999), the Connecticut Supreme Court upheld a trial court's determination that an award of prejudgment interest was not appropriate where the complexity of the issues was such that, "the case could not have been resolved without a full trial." The court finds that an

award of prejudgment interest would be similarly inappropriate here, where a three day trial and a fact-intensive investigation were necessary to decide the question of unjust enrichment. Second, even when damages are related to the performance of a contract, prejudgment interest is not appropriate in situations such as this where "the damages are similar to damages in a personal injury claim in negligence where a party is seeking to be made whole for the loss caused by another." Ceci Brother, Inc. v. Five Twenty-One Corporation, 81 Conn.App. 419, 427-8 (2004). Given that the court's finding for Mr. Pierce was based on the unjustified delay caused by Attorney Nagel, the damages in this case sound more in negligence than in contract, and therefore are not appropriate for the application of section 37-3a interest. See Id. at 428 (claim for negligence would not allow §37-3a interest as a matter of law.).

## IV. Conclusion

Based on the preceding findings of fact and conclusions of law, the court orders that judgment enter in favor of the defendants on Counts 1, 2, 3, 5 and 6 and for Mr. Pierce on Count 4 in the amount of $123,629.48.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 27th day of December, 2007.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge